IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MICH AUREL, #317239 | * | |
| Plaintiff, | | |
| v. | * | CIVIL ACTION NO. ELH-15-1581 |
| | | |
| PARRISH T. KAMMAUF | * | |
| CDRM SCOTT STEININGER | | |
| MICHAEL S. YACENECH | * | |
| Defendants. | | |
| | ***** | |

**MEMORANDUM**

Mich Aurel,[1] the self-represented plaintiff, filed this civil rights action under 42 U.S.C.

§ 1983 against defendants, dietary staff at the North Branch Correctional Institution ("NBCI"),

where Aurel is an inmate.  Defendants have filed a motion to dismiss or, in the alternative, for

summary judgment.  ECF 19.[2]  It is supported by a memorandum (ECF 19-1) (collectively, the

"Motion"), and several exhibits.  No opposition to the Motion was filed, and the time to do so

has expired.[3]  However, on January 8, 2016, Aurel filed a "motion" reiterating his claims that

_____

[1] The Maryland Department of Public Safety and Correctional Services ("DPSCS") lists plaintiff as Mich Aurel on its "inmate locator" website.  Although plaintiff was prosecuted as Aurel Mich in the Maryland courts, I will refer to plaintiff using the DPSCS designation of Mich Aurel.

[2] Defendant Scott Steininger, whose name was not included in the dispositive motion, filed a notice on the date the dispositive motion was filed, seeking to join the motion.  ECF 22. It appears that his name was inadvertently omitted; like the other defendants, he is represented by the Attorney General of Maryland.  His request shall be granted.

[3] Pursuant to the dictates of *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975), on December 9, 2015, Aurel was notified that defendants had filed a dispositive motion, which could result in the dismissal of his case.  ECF 23.  He was informed that he was entitled to file an opposition within seventeen days, and that his failure to do so could result in the dismissal of his case or in the entry of judgment against him.  *Id.*

"for yrs" he has received incomplete kosher meals, and has not received sufficient amounts of salt, pepper, salad dressing, mayonnaise, relish, margarine, coffee, and fresh vegetables. ECF 24. I shall consider ECF 24 as an Opposition.[4]

In addition, defendants have moved for reconsideration (ECF 21, "Motion to Reconsider") of the Court's Order (ECF 7) granting in forma pauperis status to Aurel.

The court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2014). For the reasons that follow, defendants' Motion (ECF 19), construed as one for summary judgment, shall be granted. Defendants' Motion to Reconsider shall be denied.

## I. Background

Aurel alleges that his rights were violated when, as a member of the NBCI Jewish community, he was denied kosher meals on unspecified dates and was not provided condiments (salt, pepper, dressing, margarine, and mayonnaise), forcing him to "eat all the vegetables." He further claims he has been discriminated against and "abused" by dietary staff. Aurel seeks monetary damages. ECF 1 at 3.[5]

Parrish Kammauf is the Correctional Dietary Manager at NBCI and Michael Yacenech is the NBCI Correctional Dietary Officer Supervisor. ECF 19-1 at 1. In response to the Complaint, defendants state that a Statewide kosher food diet/menu was created for inmates of the Department of Public Safety and Correctional Services ("DPSCS"), after consultation with

---

[4] In the "motion," Aurel adds as defendants Assistant Warden Jeff Nines, Chaplain Kevin Lamp, and Rabbi Rachmiel Tobesman. ECF 24. However, Aurel does not set out any specific allegations against them. Therefore, he shall be denied leave to amend his Complaint at the eleventh hour to include these individuals as parties.

[5] All docket references are to the court's electronic pagination.

Rabbi Rachmiel Tobesman, who has determined that the current menu at NBCI "meets the tenants [sic] of the Jewish religion." ECF 19-3, Decl. of Maximo-Sabundayo, Dietary Director of DPSCS, at 2.  Defendants also note that the Rabbi has responded to Aurel's concerns regarding his kosher diet.  In a letter of June 4, 2014, the Rabbi assured Aurel that he has "checked the kosher kitchen facilities" at NBCI, and NBCI is in compliance with the requirements of a kosher kitchen, so as to satisfy the essential requirements of "Halacha" or "Jewish Law."[6]  ECF 19-4 at 2.  And, as the Rabbi explained to Aurel in a letter of June 4, 2014: "Due to the complexities of kosher requirements, only a kitchen that provides a diet consisting of diary [sic]/vegetarian/fish can be maintained."  *Id.*  Kammauf, the NBCI Dietary Manager, avers that, to the best of his knowledge, all kosher diets provided at NBCI in 2013, 2014, and 2015 were prepared and followed according to proper food standards.  ECF 19-5, Kammauf Decl.

Defendants also assert that a condiment is provided to inmates based on whether a condiment is listed for that meal according to the dietary menu.  Inmates who wish to obtain alternative or extra condiments, not provided by the dietary department with a particular meal, may, if available, purchase the condiment through the commissary.  ECF 19-3, Maximo-Sabundayo Decl.  Moreover, in another letter from the Rabbi to Aurel, dated August 21, 2014, the Rabbi told Aurel:  "The use of condiments such as salt, pepper, salad dressing and mayonnaise are kosher certified and are facility dietary issues and not kosher issues."  ECF 19-4 at 3.

---

[6] Defendants also provided DPSCS's Executive Directives and COMAR Regulations concerning the Kosher Platform Diet Requirements.  *See* ECF 19-2 at 22-27 & 37-42.

In addition, defendants have provided documentation to show that Aurel filed a number of grievances through the DPSCS's administrative remedy procedure ("ARP") regarding the alleged failure in 2013, 2014, and 2015 by DPSCS to provide him with a "complete" kosher diet or seasoning and dressing for his food.[7]  ECF 19-2 at 2-20, 28-36, & 44-126.  According to the Declaration of Scott Oakley, then the Executive Director of the Inmate Grievance Office ("IGO"), Aurel filed two grievances with the IGO alleging deficiencies with his Kosher diet. ECF 19-6, Oakley Decl.   Both grievances were administratively dismissed by the IGO due to Aurel's failure to properly exhaust the ARP process.   *Id*.   Therefore, defendants argue that Aurel did not properly pursue his claims to all levels of review, and thus he has failed to exhaust his administrative remedies.   Accordingly, they contend that Aurel's Complaint should be dismissed.

## II.  Standard of Review

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  ECF 19. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must

---

[7]  Defendants furnished an exhibit log of Aurel's ARPs, including those relating to his dietary meals.  *See* ECF 19-2 at 127-131.

4

be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).  When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that  conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[8]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Industries,*

---

[8] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

*Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f))

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit…itself sufficient grounds to reject a claim that the opportunity for

discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

Aurel has not filed an affidavit under Rule 56(d).  In light of the foregoing, I am satisfied that it is appropriate to address the defendants' motion as one for summary judgment, as this will facilitate resolution of the case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:  By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black &. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a genuine dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence

8

"is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because Aurel is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### III.  Discussion

### A.  Failure to Exhaust Administrative Remedies

Defendants argue that Aurel's claims must be dismissed because he has failed to fully exhaust available administrative remedies, as required by the Prison Litigation Reform Act of 1995 ("PLRA"), 110 Stat. 1321-71, as amended, 42 U.S.C. § 1997e(a).  Exhaustion of administrative remedies is an affirmative defense, which is most properly considered on a motion for summary judgment.  *See Jones v. Bock*, 549 U.S. 199, 216 (2007).

The Prisoner Litigation Reform Act provides, in pertinent part:

(a) Applicability of administrative remedies

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e.

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones v. Bock*, 549 U.S. at 215-216; *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

The PLRA's exhaustion requirement serves several purposes. These include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219; *see Moore*, 517 F. 3d at 725 (exhaustion means providing prison officials with the opportunity to respond to a complaint through proper use of administrative remedies). It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase v. Peay*, 286 F.Supp.2d 523, 530 (D. Md. 2003), *aff'd* 98 Fed. Appx. 253 (4th Cir,. 2004); *Gibbs v. Bureau of Prisons*, 986 F.Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for

failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *See Moore v. Bennette,* 517 F.3d 717, 725, 729 (4th Cir. 2008); *Langford v. Couch,* 50 F.Supp.2d 544, 548 (E.D. Va. 1999) ("[T]he PLRA amendment made clear that exhaustion is now mandatory."). But, this court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007).

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In *Ross v. Blake*, ___ U.S. ___, 2016 WL 3128839 (June 6, 2016), the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." *Id.* at *3. In particular, it rejected a "special circumstances" exception to the exhaustion requirement. *Id.* at *5. But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id.* at *3.

The Fourth Circuit addressed the meaning of "available" remedies in *Moore v. Bennette,* stating, 517 F. 3d at 725:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it.

*See Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. *Id*. at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

More recently, in *Ross v. Blake*, the Supreme Court stated that an administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 2016 WL 3218839, at *7 (quoting *Booth*, 532 U.S. at 738). Thus, an inmate must complete the prison's internal appeals process, before bringing suit. *Chase v. Peay*, 286 F. Supp. 2d 523, 529-30 (D. Md. 2003), *aff'd*, 98 F. App'x 253 (4th Cir. 2004).

The DPSCS has made an "administrative remedy procedure" available to Maryland State prisoners, within the meaning of 42 U.S.C. § 1997e(a), for the submission of "grievance[s] against…. official[s] or employee[s] of the Division of Correction." Md. Code, Correctional Services Article ("C.S.") § 10-206(a); *see generally* C.S. §§ 10-201 *et seq.*; Code of Maryland Regulations ("COMAR") 12.07.01.01(B)(1) (defining ARP). Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance' to include a "complaint of any individual in the custody of the [DOC] . . . against any officials or employees of the [DOC] . . . arising from the circumstances of custody or confinement." COMAR 12.07.01.01B(8).[9]  An inmate "must exhaust" the ARP process as a condition precedent to

_____

[9] Maryland appellate case law indicates that the administrative grievance procedure does not encompass "'every kind of civil matter that could be brought by a DOC inmate.'" *Massey v. Galley*, 392 Md. 634, 646, 898 A.2d 951, 958 (2006) (citation omitted). Rather, it applies only to matters that "relate to or involve a prisoner's 'conditions of confinement.'" *Id*. at 651,

further review of the inmate's grievance. *See* C.S. § 10-206(b); *see also* COMAR 12.07.01.02.D; DCD 185-002 (effective August 27, 2008). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006).

In Maryland, filing a request for administrative remedy with the warden of the prison is the first of three steps in the ARP process. *See* COMAR 12.07.01.04. The ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the inmate first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.07.01.05A. If the request is denied, a prisoner has 30 calendar days to file an appeal with the Commissioner of Correction. COMAR 12.07.01.05C. If the appeal is denied, the prisoner has 30 days to file a grievance with the IGO.  *See* C.S. §§ 10-206, 10-210; COMAR 12 07.01.03; COMAR 12.07.01.05B. *See also Division of Correction Directive* 185-002, § VI.NI.

---

898 A.2d at 960 (citation omitted).  Thus, the grievance procedure does not apply to requests for public information under the Maryland Public Information Act, *see id.*, nor does it apply to medical malpractice claims against private medical service providers who treat inmates under contract with the DOC.  *See Abramson v. Correctional Med. Servs., Inc.*, 359 Md. 238, 753 A.2d 501 (2000).

Moreover, the administrative grievance procedure does not apply to claims for compensation for disabilities resulting from "personal injury arising out of and in the course of [an inmate's] work for which wages or a stipulated sum of money was paid by a correctional facility," C.S. § 10-304, for which a claim to a different administrative body, the Sundry Claims Board, is the exclusive remedy.  *See Dixon v. DPSCS*, 175 Md. App. 384, 927 A.2d 445 (2007). On the other hand, the grievance process does apply to a wide variety of claims that arise out of the conditions of confinement, even if the grievance process cannot provide a comprehensive remedy for such claims, such as tort claims of assault and battery against prison officers.  *See McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989).

Complaints are reviewed preliminarily by the IGO. *See* C.S. § 10-207; COMAR 12.07.01.06A. If the complaint is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1); *see* COMAR 12.07.01.07B. The order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* C.J. § 10-208(c); COMAR 12.07.01.07-.08. The conduct of such hearings is governed by statute. C.S. § 10-208.

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination. However, a decision concluding that the inmate's complaint is wholly or partly meritorious constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge. *See* C.S. § 10-209(b)-(c).

The final agency determination is subject to judicial review in Maryland State court, so long as the claimant has exhausted his/her remedies. *See* C.S. § 10-210. But, an inmate need not seek judicial review in State court in order to satisfy the PLRA's administrative exhaustion requirement. *See*, *e.g.*, *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir.) ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court."), *cert. denied*, 537 U.S. 949 (2002).

The record illustrates that from December 2013 to August 2015, Aurel filed numerous ARPs, twenty-one (21) of which were related to his alleged failure to receive a complete Kosher diet and/or adequate condiments.   Defendants claim that while Aurel did appeal two of

grievances to the IGO, they were administratively dismissed for the failure to properly exhaust the ARP process.  *See* ECF 19-6, Oakley Decl.  Aurel does not rebut defendants' contention, nor does he claim that the ARP process was unavailable to him.  Indeed, the sheer number of ARPs that Aurel submitted suggests that the ARP Process is available and Aurel has frequently availed himself of the process .  Therefore, the court shall dismiss that case on the basis of the affirmative defense of exhaustion.  I explain below.

Even were the court to review Aurel's claims on the merits, however, it would find no basis to conclude that defendants are liable.  I explain below.

### B.  Personal Liability.

A plaintiff must allege sufficient facts to place defendants on fair notice of the nature of claims raised against them.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A complaint must contain sufficient factual matter, accepted as true, to "'state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)(quoting *Bell Atlantic Corp.v. Twombly,* 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Although factual allegations must be accepted as true for purposes of a motion to dismiss, this principle does not apply to legal conclusions.  *Id.*

To be sure, while a plaintiff need only plead a short and plain statement of the claim establishing that he or she is entitled to relief, *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992).  But, "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do.'" *Twombly,* 550 U.S. at 555.  A complaint must contain "sufficient allegations supporting the reasonable inference that the defendant is liable for the misconduct

alleged." *Harris v. SunTrust Mortg., Inc.,* No. 12–cv–378, 2013 WL 1120846, at *2 (M.D. N.C. Mar. 18, 2013) (citing *Twombly,* 550 U.S. at 555).

Defendants correctly observe that, aside from naming them in the caption of the Complaint, Aurel has failed to set out any particularized allegations indicating how defendants violated the law or injured him.   Therefore, Aurel has failed to set out a colorable claim against the named defendants.

### C.  Failure to Demonstrate a Statutory/Constitutional Violation.

The Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc et seq., provides, in part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-
>
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).

"RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion."  *Cutter v. Wilkinson,* 544 U.S. 709, 721 (2005); *see Holt v. Hobbs,*--- U.S.---, ---, 135 S.Ct. 853, 859–60  (2015); *Smith v. Ozmint,* 578 F.3d 246, 250 (4th Cir. 2009); *Lovelace v. Lee,* 472 F.3d 174, 186 (4th Cir. 2006).

Under RLUIPA, the inmate initially must show that the challenged policy substantially burdens his exercise of his religion. *See* 42 U.S.C. § 2000cc–2(b); *Holt*, 135 S.Ct. at 862. The statute defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A); *Holt,* 135 S.Ct. at 860; *Smith.* 578 F.3d at 251. A substantial burden places "substantial pressure on an adherent to modify his behavior and to violate his beliefs" or "forces a person to choose between following the precepts of [his] religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of [his] religion on the other hand." *Lovelace,* 472 F.3d at 187 (alterations and quotations omitted).

Once the inmate makes a prima facie showing, the burden shifts to the government to prove that "the burden in question is the least restrictive means of furthering a compelling governmental interest." *Smith.* 578 F.3d at 250; *see Holt.* 135 S.Ct. at 863. "RLUIPA adopts a ... strict scrutiny standard." *Couch v. Jabe.* 679 F.3d 197, 203 (4th Cir. 2012) (alteration in original) (quotation omitted). Under RLUIPA, the court must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter,* 544 U.S. at 723 (quotation omitted); *see Smith*, 578 F.3d at 252. "Security concerns deserve particular sensitivity." *Smith.* 578 F.3d at 252 (quotation omitted). "However, 'a court should not rubber stamp or mechanically accept the judgments of prison administrators.' Rather, due deference will be afforded to those explanations that sufficiently 'take[ ] into account any institutional need to maintain good order, security, and

discipline.' " *Couch,* 679 F.3d at 201 (quoting *Lovelace,* 472 F.3d at 190) (alteration in original) (citation omitted); *see Holt.* 135 S.Ct. at 866.[10]

Defendants assert that Aurel has received a constitutionally adequate kosher diet and his food has been prepared in accordance with all DPSCS religious food standards.   In support of their contention, they provide the declarations of the DPSCS Dietary Director, Maximo-Sabundayo, and NBCI Dietary Manager Kammauf, along with Kosher Diet Platform Requirements and correspondence from Rabbi Tobesman.   As noted, the Rabbi explained to Aurel in a letter of June 4, 2014: "Due to the complexities of kosher requirements, only a kitchen that provides a diet consisting of diary [sic]/vegetarian/fish can be maintained."   ECF 19-4 at 2.   Aside from plaintiff's conclusory claims that he has not been provided a kosher diet, Aurel does not indicate how his meals failed to comply with established kosher food preparation or composition requirements.   Indeed, plaintiff's claims are comparable to his institutional grievances; they primarily focus on his concerns involving the adequacy of condiments provided with his meals, such as salt, pepper, mayonnaise, margarine, and salad dressing. However, as the Rabbi told Aurel in a letter of August 21, 2014 (ECF 19-4 at 3), the matter of condiments is a dietary issue, not a religious issue.   *Accord*, ECF 19-3.

Under federal law, prisoners are entitled to meals that meet their nutritional and dietary needs.   *See Bolding v. Holshouser*, 575 F.2d 461 (4th Cir. 1978).   The failure to meet those

---

[10] In addition, when filing a 42 U.S.C. § 1983 complaint raising a First Amendment claim, an inmate must demonstrate that a prison policy or regulation substantially burdens the exercise of his religion.   *See Lovelace v. Lee,* 472 F.3d   at 198 n. 8; *Brown v. Ray.* 695 F.Supp.2d 292, 300 (W.D. Va. 2010).   If an inmate shows a substantial burden, the court must then examine four factors to determine whether the policy is reasonably related to a legitimate penological interest.   *See Turner v. Safley*, 482 U.S. 78, 89–90 (1987).

needs states a colorable constitutional claim, so long as the deprivation is serious; the defendants are deliberately indifferent to those needs; and the inmate experiences a deleterious effect from the deprivation.  *Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991); *White v. Gregory*, 1 F.3d 267, 269 (4th Cir. 1993).   In order for the restriction of food to rise to the level of a constitutional violation, there must be some facts pertaining to adverse effects caused by the alleged condition and inadequacy of the food.  *See Johnson v. Ozmint*, 456 F.Supp, 688, 696 (D. S.C. 2006) (dismissing claims as to cold food in insufficient quantities where the plaintiff made no factual allegation of adverse effects caused by the condition of the food) (citing *Harrison v. Stallings,* 898 F.2d 145, 1990 WL 27233 (4th Cir. 1990) (per curiam)).  Aurel does not claim that the quantity and quality of the food furnished to him failed to meet his dietary or nutritional needs, causing him physical harm.  There is no allegation that the food portions that were provided to Aurel were so meager and inferior as to have a detrimental impact on his health.

The unrefuted declarations and exhibits show that Aurel was provided a diet in compliance with the dictates of the established kosher diet platforms.  There is no merit to his challenge to the general dietary needs of the food he was provided.[11]  Consequently, defendants' Motion, construed as one for summary judgment, shall be granted by separate Order.

Defendants also filed a Motion to Reconsider, seeking review of the court's grant (ECF 7) of Aurel's indigency motion (ECF 2), claiming it is barred by 28 U.S.C. § 1915(g).  *See* ECF 21.

---

[11] In light of the aforementioned findings, the court need not rule on defendants' claim of qualified immunity.

Aurel has amassed three "strikes" under 28 U.S.C. § 1915(e), as he has had three cases dismissed under that statutory provision. *See Mich v. Nice, et al*., Civil Action No. JKB-14-1397 (D. Md.); *Aurel v. Gainer, et al.*, ELH-15-1750 (D. Md.); and *Aurel v. Jones, et al.*, ELH-15-1928 (D. Md.). He is advised that he may not proceed in forma pauperis in the future, unless he can demonstrate real and imminent threat of physical injury under the exception standard set out under § 1915(g). Nonetheless, I shall deny the Motion to Reconsider and shall dismiss the case on the grounds set out herein.

Date:  June  22 , 2016                    _____/s/_____
                                          Ellen L. Hollander
                                          United States District Judge